## No. 692.

HERMAN MEYER, ADMINISTRATOR, VS. JOSEPH KING, ADMINISTRATOR.

The written acts of a party to a contract, when they express the true intent, and explain the real nature of the contract, are admissible in evidence, even when establishing a different form of contract.

The authority to sign another's name to a single act, if done by order of, and in the presence of the principal, need not be in writing.

APPEAL from the Fourteenth Judicial District Court, parish of Ouachita. *Parsons*, J.

*Robert J. Caldwell* and *John H. Dinkgrave,* for plaintiff and appellant.
*Cobb & Gunby,* for defendant.

The opinion of the court was delivered by

DEBLANC, J. Defendant, as administrator of the succession of Simon King, advertised to be sold on the seventh of April last, and as belonging to said succession, a tract of land alleged by plaintiff to be the property of the succession of Jesse Sherman

The intended and advertised sale was enjoined by plaintiff, as administrator of the succession of said Jesse Sherman. He prays that the latter's succession be recognized as the owner of that land.

His injunction and action are based on private instruments, two of which were excluded, and two admitted as evidence by the lower court. The admitted and excluded instruments are the following, to wit:

First—A receipt from Simon King, dated Trenton, La., January 21, 1875, in which he acknowledges that, in part payment of a certain tract of land sold by him to Jesse Sherman, he received from said Sherman the sum of $168 64.

Second—A written declaration, of the same date as the receipt, delivered by King to Sherman, in and by which the former " obligated himself to wait," in the terms of that declaration, "*for the payment on that land that I sold to Jesse Sherman two years for the payments.*"

Third—An act of lease from Simon King to Jesse Sherman of the land in controversy, for the year 1876, at the rate of three dollars and ten cents per acre, payable on the first of November, 1876.

Fourth—Another act subscribed by Simon King, on the day the lease appears to have been agreed to, in and by which he stipulated "*that the payments made by Jesse Sherman for the lease of the land shall be placed to the credit of said Sherman as of a contract of sale. And, further, that if, on the first of November, 1877, he, Sherman, shall make his second payment, as shown by the recorded lease, or any day after the agreement of parties, then and in that case the whole one hundred and sixty acres of land to revert to him, and their contract to have, in the event of said payment, the force and effect of an act of sale as between the parties.*"

What is called a lease, and the act which reveals its character, were passed on the twenty-fourth of June, 1876, eighteen months after King had acknowledged having received from Sherman, in part payment of the land sold by the former to the latter, $168 64, eighteen months after the extension of time allowed Sherman to pay the balance then due on the price of the land.

We are left to infer what was the price fixed between the parties, and the balance due on that price in January, 1875. The evidence on that point is vague and incomplete. Was the land cleared? Was it improved? Was it of a good or inferior quality? If it was a forest, who converted it into a productive field? Was it King? Was it Sherman? What was, and what is, its value? For what price was it sold?

Sherman, who was, and who died, poor, would not have imagined and consented to lease, on the twenty-fourth of June, a tract of land which was in his possession at least five months before, and on the successful cultivation of which he depended to satisfy, whatever it may have been, his obligation toward King. From the scanty amount of the inventory of his estate, we can justly presume that his only resource was his labor, and, unless driven from overflowed fields, laborers, in our State, do not lease in June to harvest in November.

In 1876, Sherman raised a crop on the land. When was it commenced? Was it on the twenty-fourth of June? That is not probable. We have every reason to believe that, in January, 1875, Sherman was on that land, and that, when he paid a part of its price, he was not merely in possession, but that his possession dated from either a sale or a promise of sale anterior to the payment of January, 1875. At that time, King acknowledged, over his signature and in presence of two witnesses, that he had sold that land to Sherman; that he had received from Sherman a specified portion of the price of that sale, and that, for the payment of the balance of that price, he had allowed to Sherman a delay of two years.

In one of the agreements of the twenty-fourth of June it is expressly stipulated that, *if on the first of November, 1877, Jesse Sherman makes his second payment, as shown by the recorded lease,* he shall acquire title

to the whole of the land. The first payment was made; that can not be disputed. Thereafter Sherman was sued, his crop seized, and a second payment was made. Was it not the last that could have been legally enforced by King or the representative of his succession?

We are told that the time fixed for the last payment is the first of November next, 1877. Is not this a clerical error? Does that date correspond with that fixed in the document which evidences the granting of an extension of time? In January, 1875, King bound himself to wait until January, 1877, the space of two years, for the payment of the balance of the price. At that date, cotton is generally gathered, shipped, or disposed of, and it may have been on that account that the time of payment was changed from January, 1877, to November, 1876.

This is but an inference, but one which grows out of positive facts. Two documents were signed by King and delivered to Sherman on the twenty-first of January, 1875. In one of them, the delay of two years is granted, not by fixing any day of any month for the expiration of said delay, but in so many words, "two years." It is not denied that the twenty-first of January, 1875, is the date when those twin documents were signed and delivered, and, as a matter of course, the period agreed upon for the second payment was originally the twenty-first of January, 1877.

To secure King, to give him, on the crop of 1876, the lessor's privilege, to enable him to seize that crop, the lease of June was added to the previous sale or promise of sale. In the lease, the term of payment was advanced; and, as we have already said, the payment which, under the first agreement, was to be made in January, 1877, was fixed, in the lease, on the first of November, 1876.

It is urged that two additional payments were to be made, after that of the twenty-first of January, 1875. That supposition is not sustained by any part of the evidence. The word "payments" is in one of the documents, at the end of the last line; but, in the very same document, King said: "*I obligate myself to wait for the payment on the land.*" In the promise of sale or conditional sale of the twenty-first of June, 1876, there are two important stipulations:

First—The payments made by Sherman were to be credited on the price of the land; and, further, we now copy from the act itself: "*If, on the first day of November, A. D. 1877, Jesse Sherman makes his second payment, as shown by the recorded lease, etc., this contract shall have the force and effect of a sale.*" In this stipulation there is an apparent contradiction. The only payment to be made, at least *as shown by the act of lease,* was to be made on the first of November, 1876. That clear and positive declaration "*as shown by the lease,*" could not have escaped the parties' attention, and repels the conclusion that any payment was fixed

for the first of November, 1877. Under this construction, the second payment, the payment which was to give to the parties' contract the effect and the force of a sale, was made before the institution of this suit.

Defendant has filed and urges the plea of *lis pendens*. That plea was properly overruled. Sherman's representative could not legally resist the payment of the balance due to the succession of King; but, as soon as that payment was made, the right of action to recover the land or enjoin its intended sale accrued to the succession of Sherman. If that payment was the second, it vested the title to the land in the last-mentioned succession. If, as alleged by defendant, there is still another, a third payment, to be made in November, 1877, the term of the presumed obligation has not arrived, and the administrator of the estate of King could not, before that term, advertise for sale the land in controversy.

The receipt from King to Sherman, and the agreement for an exten-. sion of time, should not have been excluded by the lower court; they constitute, if not a complete title, the commencement of a title; they do not contradict, they explain, the act to which the parties have given the form of a lease; they corroborate the stipulations of the instrument called a counter-letter; they are the component parts of one and the same contract, the corresponding links of the evidence of that contract.

That a lessee's possession is that of the lessor, that the lessor's title can not be assailed by the lessee, is not, could not, be disputed. In this case, it is manifest the lease was intended as a security for the payment of the balance due on the price of a sale or not less than a promise of sale. It did not impair or destroy, it reiterated and confirmed, when coupled with the counter-letter, the stipulations of the sale.

On the trial, defendant, a son of King, was asked whether he had signed his father's name, with his father's consent, to the counter-letter herein referred to. That question was objected to, on the ground that the authority to sign such a document can be shown but by a written act. The objection was sustained. This was an error. The counter-letter was not the mandate, but the act signed for, in presence and under the instructions of the parent. That authority was delegated for only one object, was not to be exercised out of the interested parties presence, lasted the space of time required to write a name, and expired when the last letter of the principal's name fell from the agent's pen. In such a case, the act itself is the act of the principal, not of the agent.

The witnesses whose names are affixed to some of the documents copied in the transcript, may be able to explain the apparent contradiction in the dates mentioned in the act granting the extension and the act of lease; they and others may prove whether Sherman has built on and

improved the land, when he took possession of the same, and when and under what circumstances that possession ceased.

If plaintiff has not paid the whole of the price agreed upon, he has paid of that price the sum of $664 64. Though his petitory action may have been premature, his injunction was properly issued, and should have been maintained until the final determination of this controversy, or, if there yet remains due a balance of the price, until the date fixed, according to the pleadings of defendant himself, for the payment of that balance.

We consider as indispensable a new trial of this case.

It is, therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that this case be remanded to the lower court, to be proceeded with according to law; the costs of the appeal to be paid by defendant.