JOSEPH R. MORTON

*v.*

ANNIE MURRAY *et al.*

*Opinion filed October 24, 1898.*

1. STATUTE OF FRAUDS—*when action may be brought on instrument written by another.* An action concerning land may be brought on an instrument written and executed by the hand of another, in the presence and at the dictation of the party to be charged, without violating the Statute of Frauds, as the act must be regarded as the act of the party to be charged, and not as that of an agent requiring proof of written authority.

2. EVIDENCE—*fact that letter was written at dictation may be proved by parol.* The fact that a letter written by the hand of another was written at the dictation and in the presence of the party to be charged, may be proved by parol evidence of the statements of the party to be charged, or of any other relevant circumstances.

3. The court reviews the evidence in this case at length, and holds that the contract in question is not within the Statute of Frauds, and that appellant is entitled, under the evidence, to a decree of specific performance, as prayed in his bill.

MAGRUDER, J., dissenting.

APPEAL from the Circuit Court of McDonough county; the Hon. CHARLES J. SCOFIELD, Judge, presiding.

This bill for specific performance was brought by appellant, Joseph R. Morton, against the heirs-at-law of John F. Murray, deceased, to compel them to make him a deed to the east half of the south-east quarter of section 18, in township 5, north, range 3, west, in McDonough county. The bill alleged that appellant, in August, 1873, being then fourteen years old, went to live with and work for John F. Murray, whose wife was appellant's aunt, and that he so lived with and worked for Murray on his farm, as a farm hand, until August, 1880; that the work he did was reasonably worth twenty dollars a month, and that all he ever received for such work was just enough to clothe him,—about twenty-five or thirty dollars a year;

that when he quit working for Murray he complained to him that he had not been paid enough for his work, and that then Murray, for the purpose of quieting and satisfying him, told him that whenever he got married and settled down he would give him a piece of land that would more than recompense him for all he had ever done for him, and that he, appellant, believing and trusting in such promise, let the matter of his wages pass; that afterwards he went to Nebraska and there farmed, and while living in Nebraska, and still being a single man, Murray wrote, or caused to be written, and sent to him by mail, his (Murray's) contract, as follows:

"Colchester Illi February the 4 1886.

"Dear nephew  wee are all well ase i hope this will find you the same well Jo your uncle John wanted mee to rit to you for him  this is what he sed  well Jo ase I have always promest to give yo a farm I have bought the Billey O Stevens farme and the Dan Clark forty for yo  I want you to get you a wife and come home and tind it and give me the tofiths ase long as I live then to Lisey as long as she lives and at oure deth the land shall be yours  I will make you a dead to it  I think this will pay you for all the work you have don for mee  I will tile it out and help you to fixt up the house and barn and ase mutch other improving as I see fit to do  but don't marry some one that you don't like just to get the land for if you will take it thataway and be satisfied I will cheep it five years for you if you want mee to for the rent that I get from others will be the same ase what you would pay me for the land  but if not I will sell the land  I want to give Wib the same çind of a canche on a pece of land  no more at present  I will close hoping to hear frome you soo

from X J F MURRAY

by MISS JOHN MURRAY"

The bill further alleged that Murray seldom did any writing, except sometimes signing his name, and that his wife was in the habit of doing his writing for him and signing his name to all papers, and that she wrote the foregoing letter and signed his name to it at his instance; that the words "nephew" and "Jo" in the letter referred to appellant, and "Lisey" to Mrs. Murray, and that the

land referred to was the land above described; that appellant notified Murray that he would take the land and accept the proposition made in said contract in full satisfaction of all claims against him. The bill further alleged that the complainant was married in March, 1889, and that on account of the land being then rented he did not move into the house then on the premises until March, 1890, and that he then took possession for the purpose of complying, and in compliance, with the terms and conditions of the contract; that he remained on the land and farmed it until March 1, 1895, and paid Murray two-fifths of all that was raised and grown on the land, and also for the use of the pasture, all to Murray's entire satisfaction, and that he made lasting and valuable improvements on the farm; that wishing to farm more land he rented eighty acres about three miles distant and farmed it for several years; that in the spring of 1895, after consultation with and on the advice of Murray, he rented a quarter section in another township and moved on the same in order to save the loss of time in going to and from his house, and that it was then understood between them that he should move back on the Murray land in the fall of 1896 and farm it and hold it just the same as before, and that Murray would, before his death, convey the same to him; that he had made all arrangements and did intend to move back into the house in October, 1896, when the tenant was to move out, but that the heirs of Murray, (Murray and wife having died,) in order to hinder and prevent him from taking possession, surreptitiously procured one Stoneking to move into the house before the tenant had vacated the same, and that Stoneking was now unlawfully in possession under one Wilbur Sutton, who claimed the land. The bill further alleged that Murray died testate April 9, 1896, and by his will devised certain lands to said Wilbur Sutton, but the parcel of land here in controversy was not mentioned in said will; that said Murray left no widow, child or children surviving him. The

bill prayed for specific performance of the contract and for general relief.

Defendants, in their answer, denied all the material allegations in the bill specifically, claiming that appellant's possession was only that of a tenant and not in pursuance of any agreement that the land was to be his, and set up and pleaded the Statute of Frauds as to any such agreement. On the hearing the bill was dismissed for want of equity, and appellant has appealed to this court.

C. F. WHEAT, for appellant.

NEECE & SON, for appellees.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

This was a bill for the specific performance of a contract to convey eighty acres of land. We are satisfied that the principal allegations of the bill were sustained by the evidence, and that the decree appealed from is erroneous. The complainant, Morton, who was a nephew of Murray's wife, from the age of fourteen lived in the family of Murray, and worked for him for upwards of six years, performing for the greater part of the time the labor of a hired hand, but received for his services little more than his clothing. Murray regarded him with affection, and considered himself indebted to Morton, and promised to convey to him a tract of land, to become his property at his (Murray's) death. It was proved beyond dispute that Murray repeatedly said that he purchased the two forty-acre tracts constituting the land in controversy for Morton, and that he intended to convey them to him. It was also clearly proved that the letter set out in the preceding statement was written at the request of Murray, by his wife. The contention that it was not shown to have been written in the presence of Murray,

at his dictation, so as to avoid the application of the Statute of Frauds, will be noticed at another place. It was also sufficiently proved by statements of Murray that Morton had written a letter accepting the propositions contained in Murray's letter, and his acceptance was also otherwise shown. One witness testified that he heard a letter from Morton to Murray read in the presence of Murray and his wife, accepting the proposition. He returned from Nebraska, where he was living when the letter was written, got married, and moved upon, cultivated and improved the land for five years, and paid to Murray two-fifths of the crops, as stipulated in the letter.

Much evidence was introduced on the hearing tending to prove that the letter dated February 4, 1886, was dictated by John Murray. Jane Hilgen, a witness for complainant, testified: "Am a sister of complainant. John F. Murray's wife was a sister of our mother. Have known Mr. Murray ever since I can remember. I will be forty years old next birthday. I resided with the Murrays. I went there in 1873 and lived there until 1877, when I was married. They never had any children. Mrs. Murray died December, 19, 1894. Mr. Murray died April 16, 1896. Mr. Murray did not do his own writing when I stayed there. He was very nervous. I do not remember of any letter or other paper he wrote while I was there. He made a mark—kind of a cross. I saw him sign papers that way. It is on my deed that I have. While I lived there I never saw him make his cross to any papers where his name was signed, only to letters. I have seen them to letters. Mrs. Murray wrote the letters. I am acquainted with Mrs. Murray's handwriting, and would know it anywhere I saw it. While I was there she always did his writing." Witness was here shown a paper, a letter dated April 25, 1885, and said it was in the handwriting of her aunt, Mrs. Murray. Witness was shown a paper, a letter dated February 4, 1886, and said it was in Mrs. Murray's handwriting, and that the cross is some-

thing like she has seen him (Murray) make. "I have written letters for him myself, and he signed his mark on the letter."

Edgar Sutton testified: "I have seen Uncle John F. Murray write some, but not very much. I never saw him write a letter, but I think I would know his handwriting. I never saw him write anything but his name. I have heard Mr. Murray request his wife, Elizabeth, to write letters for him. During the time I resided there he always got his wife, Elizabeth, to write such letters as he wished to have written. I have looked at the paper now shown me, dated February 4, 1886. I know the writing. It is in Elizabeth Murray's handwriting—except I do not know in whose handwriting the cross is in. I can recollect of Murray telling his wife to write to Jo, but do not recollect of him telling her what to put in the letter. I heard him tell her to write to Jo something about the place. I don't know what they put in the letter about the place. The place he spoke of was the Clark forty and the Billy Stevens place. It was about 1886 I refer to. I can recollect him telling her to write to Joseph R. Morton, but I don't think she wrote right at the time. I was not in there at the time the letter was written or for a couple of days afterwards. The writing of the letter was spoken of along in the evening. I was in the house. I did not see her write any that night. Two or three days afterwards I knew of his going to mail a letter. If he had only one, that one was to Joseph R. Morton, for he had her write one to him. All I heard Murray say was, that he had got the place for Jo. He told her to write to him that he had got the place for him, and if he wanted it, to come back. I did not know whether he meant for him to farm it, or what he meant."

T. G. Riden testified that he had a conversation with Murray in which "he said he had got Aunt Liza, he called her, to write a letter to Jo to come back again; that he had bought a piece of land, and he wanted him to come

and farm it long as Mr. Murray and his woman lived, then it was to fall back to Jo. His woman wrote it."

P. H. McGan testified that he and his wife visited Murray about the time of Jo's marriage. "Murray and I were in the house and he spoke about it. I told him I noticed Jo had got married. He laughed, and said, 'I expect he is aiming to hold me to my contract.' I had never heard of this contract and I asked him what he meant. He said: 'I had Aunt Eliza write a letter to Jo in Nebraska, telling him if he would come home here and marry I would buy him a place, and he just came back and did exactly what I wanted him to, and,' he says, 'I am able to do my part of the contract.' He said, 'I bought that Billy Stevens forty and that Clark forty.' He says: 'Jo can't go on this year, because it is rented. He will go on it next year.'"

The record contains other evidence of a similar import, but it will not be necessary to repeat it here.

The facts that Morton moved off the land in 1895, and that Murray paid him for some improvements which he had made, we do not, in view of the explanatory proofs, regard as of controlling importance. Morton needed more land, and had for a year or two been cultivating another tract a few miles distant, and it seems to have been agreed between them that too much time was lost in passing back and forth, and that it would be better for Morton to rent another farm of one hundred and sixty acres and move onto it for two seasons, and for Murray in the meantime to rent the eighty acres in question to others for the same part of the crops Morton had been paying. It was proved by different witnesses that after Morton moved off the land Murray repeatedly said that he was to move back in the fall of 1896, and that he intended to convey the land to him as he had agreed. Murray died in April, 1896, and Morton was prevented by those succeeding Murray in the control of the property from taking possession. There was a sufficient consider-

ation for the agreement to convey, and Morton entered upon and performed his part of the contract.

The only question upon which any doubt can arise is whether or not the Statute of Frauds must operate to prevent the specific performance of the contract. The second section of the statute provides that "no action shall be brought to charge any person upon any contract for the sale of lands * * * unless such contract, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party." It is insisted by counsel for appellees that in writing the letter and signing Murray's name Mrs. Murray acted as the agent of Murray, and it not appearing that she had any authority in writing signed by Murray, the statute applies and the suit cannot be maintained,—citing *Bissell* v. *Terry*, 69 Ill. 184, *Albertson* v. *Ashton*, 102 id. 50, and *Edwards* v. *Tyler*, 141 id. 454. These cases do not reach the question as presented by this record. It is not pretended that Mrs. Murray had any written authority from Murray to write the letter or to sign his name to it, but it is contended that the letter was the letter of Murray himself,—that it was written in his presence, by his dictation and in his name,—and we are of the opinion that this view is fully sustained by the evidence. It is true, as contended by counsel for appellees, that there is no direct evidence that Murray stood by and dictated the letter, or directed his wife to sign his name to it when it was written; but such a fact may be proved by indirect as well as by direct evidence, and we think this fact was sufficiently shown by the circumstances, and Murray's statements and admissions proved on the hearing. It was shown that he rarely did any writing, but that his wife was in the habit of doing his writing for him. He spoke of writing to Morton about the matter before the letter was written, and afterwards repeatedly spoke of having written to Morton about con-

veying the land to him, and it is not pretended that he wrote or had written more than one letter on this subject. The evidence was clear that he knew of the letter and its contents and regarded it as his own, and that he expressed his intention of complying with its terms. The testimony tended to prove that he mailed the letter himself. This proof had a further effect than to show a mere parol ratification,—it tended to prove that the act was his own. If it had been proved that after the letter was written he stated to others that his wife had written and signed his name to it in his presence and by his direction, it would not be denied that such proof would have been competent to prove that the instrument was his own individual act and not that of an agent. So, too, then, was it proper to prove the same fact indirectly, and there was practically no evidence to the contrary.

Considering the letter, also, in connection with the circumstances and Murray's admissions proved, it contains some inherent evidence of the fact contended for by appellant. After the first few lines from Mrs. Murray the language changes, as if coming directly from Murray in the first person, and in substance says: "As I have always promised to give you a farm, I have bought the Billy O. Stevens farm and the Dan Clark forty for you. I want you to get a wife and come home and tend it, and give me the two-fifths as long as I live, then to Lisey (meaning his, Murray's, wife,) as long as she lives, and at our death the land shall be yours. I will make you a deed to it. I think this will pay you for all the work you have done for me. I will tile it out, and help you to fix up the house and barn, and as much other improving as I see fit to do," etc. It was then signed, "from X J. F. Murray, by Miss John Murray." From an inspection of the original letter it would seem that the cross preceding Murray's name was placed there after the name was written, and while there was no direct evidence that he

made this cross it was proved that he sometimes signed papers in that way.

Without considering whether or not, under the facts of this case, a parol ratification of the act of Mrs. Murray, as Murray's agent, in writing the letter, acted upon in part by both parties, would be sufficient to take the case out of the statute, we are satisfied that from the proof it should have been found that the instrument or letter was that of Murray himself, and that no authority in writing to Mrs. Murray, signed by him, was necessary. One may write and execute an instrument by the hand of another when done in his presence and by his direction, and the fact may be proved by parol evidence, and an action may. be brought upon the instrument without violating the Statute of Frauds. See 1 Am. & Eng. Ency. of Law, (2d ed.) 956, and cases there cited; *Meyer* v. *King,* 29 La. Ann. 567; *Rockford, Rock Island and St. Louis Railroad Co.* v. *Shunick,* 65 Ill. 223; *Ball* v. *Dunsterville,* 4 T. R. 313; *Freeman* v. *Lose,* 14 Ohio St. 154; *Gardner* v. *Gardner,* 5 Cush. 483; *Videau* v. *Griffin,* 21 Cal. 392; *Bartlett* v. *Drake,* 100 Mass. 175. We see no reason why the fact of execution cannot be proved by parol evidence of the statements of the party to be charged, and of facts and circumstances tending to prove the principal fact, as in other cases. Treating the letter as a contract in writing to convey the land, as it was, the Statute of Frauds was not a defense to the case established by the evidence.

Finding the decree to be against the evidence it is accordingly reversed and the cause is remanded to the circuit court, with directions to enter a decree for the specific performance of the contract, as prayed in the bill.

*Reversed and remanded.*

Mr. JUSTICE MAGRUDER, dissenting.